## ELEVATOR SUPPLIES CO., Inc., et al. v. BOEDTCHER.

(District Court, D. New Jersey. November 14, 1924.)

1. Patents ⊂⊃328.

Herzog patent, 1,028,089, claims 45, 60, for elevator signaling device, *held* not infringed.

2. Patents ⊂⊃328.

Newell patent, No. 1,160,315, claim 22, for elevator signaling device, *held* not infringed.

3. Patents ⊂⊃328.

Andren patent, No. 1,109,950, for elevator signaling device, *held* not infringed.

4. Patents ⊂⊃313.

Plaintiff may discontinue patent infringement suit without prejudice on payment of costs.

In Equity. Patent infringement suits by the Elevator Supplies Company, Incorporated, and others, against Franz Boedtcher. Bills dismissed.

Decree modified in 11 F.(2d) 615.

Emerson R. Newell and H. Dorsey Spencer, both of New York City, for complainants.

Richard Eyre and Ralph L. Scott, both of New York City, for defendant.

BODINE, District Judge. The Elevator Supplies Company, Incorporated, is the exclusive licensee for the Herzog patent, 1,022,089, and the owner of the Newell patent, 1,160,315, and the Andren patent, 1,109,950. It was conceded at the trial that the plaintiff had sufficient title to maintain a suit. The defenses are noninfringement, invalidity, and some equitable defenses arising from the length of time the Herzog patent was leisurely allowed to rest in the Patent Office while the plaintiff was having the benefit of an exclusive license under the latter Armstrong patent for an elevator signaling device. A suit had been

commenced in the Southern District of New York on the Andren patent. The Circuit Court of Appeals, in the Elevator Supply & Repair Co. v. New & Beaver Arcade Co., 231 F. 744, 146 C. C. A. 28, held that the defendant's device then in use did not infringe that patent. After the decree in that case had been entered, a suit, which had been commenced in this district prior thereto, upon the Herzog patent, was reinstated. In 1918 that action was discontinued for lack of prosecution; Mr. Newell, the attorney for the plaintiff, being in the army. The present action was commenced in 1922.

[1] Elevators, in the early days, were placed singly at supposedly convenient places, the signaling system being a call bell. As the skyscraper became common in cities and towns, and elevators were placed in a row, a more efficient system of signaling became of value. The Herzog patent is dated May 28, 1912, nearly 19 years after the application was filed. The application was filed November 6, 1893. The specifications, so far as pertinent, are as follows:

"My invention, in its fullest embodiment, consists in means for signaling from various floors of a building to two or more elevators in such a manner that the conductor of each car is informed whether the waiting passenger wishes to go up or down, and also whether any other conductor has answered the call, and it also enables each conductor to signal to the waiting passenger that such conductor is about to respond to the indication, and also enables each conductor to indicate to the other conductors. ⁎ ⁎ ⁎

"In the lower car this is shown as a magnet, *12,* attracting an armature whose change of position may be observed, while in the other car it is shown as an incandescent electric lamp. As already stated, the circuit which was closed by the operation of pushing a button on a floor continues closed until it is broken at some point beyond. This break may be produced by various devices, including a separate switch for each car, or, preferably, a separate switch for every indication or button (as *14, 15,* in Fig. 5), although one controller in the common wire would answer, but not always as well, because, whenever this would be operated, all of the energized buttons would be restored, instead of one only. ⁎ ⁎ ⁎

"The individual indicators of each car are preferably grouped together, so as to form as an aggregate an annunciator, and suitable indication marks in proximity to each will indicate to the operator which button it was that has been depressed, and con-

sequently which floor has signaled. In each annunciator indicators corresponding to a given button should be located in a similar position, and the corresponding cut-out switches should for convenience be placed in close proximity to the indicator of the line to which they belong.

"It is obvious that in the form selected for illustration every indicator in series on a wire will operate simultaneously, and therefore every conductor would simultaneously know that a given button had been pushed, for instance, the button on the sixth floor marked to indicate that a passenger wished to be taken up. But it is not necessary that all conductors should respond, and the conductor whose car would be in a position which would make it proper that he should be the next to take a passenger under those conditions would therefore ordinarily be the only proper one to respond, whereas the conductor or conductors of the other car or cars, although they would know that a call had been sent from that point by a passenger wishing to go in that direction, would disregard it, unless they had reason to believe that the conductor, whose duty it was, was not in a position to perform that duty, or had neglected it. In other words, it is, of course, obvious that there is no intention of having more than one car stop to take one passenger who has signaled from a given floor, the intention being to secure as the final result of the operation of the organization as a whole, and by which all the cars receive the signal, that which is set forth in the printed instructions to the waiting passenger which are ordinarily displayed on the front of the floor box in the manner shown in the illustration: 'The first car that passes in the direction indicated will stop for you.' By giving the required information simultaneously to all cars, the result is secured that, if the first car about to pass in the desired direction should not be available for any reason, as, for instance, should be moving at such speed as not to be able to stop in time, or should be too full, the next car could respond, and thus the passenger can give the effective notice in connection with a group of cars, by the act of operating one signal only, as against the necessity of operating one for each car as it existed before my invention.

"During the entire time that the indication corresponding to any floor is thus displayed in the cars, the corresponding button remains held in place as the result of the magnetic clutch described. The proper conductor, as soon as he wishes to respond, gives a tap upon the button of the cut-out switch, *14*, thus opening the circuit, whereupon three distinct effects are produced: First, the indicator corresponding to that particular line is restored to its normal condition (no matter how many other indications may be showing from other floors at the time); second, the 'answer back' or return signal is given to the passenger by the mechanical click, which he hears as his button is returned to its normal position under stress of the spiral spring *S* on the shank (and at the same time the shutter is displayed as indicated on the directions in Fig. 3); third, the corresponding indication disappears in the other car or cars, thus indicating to the other conductors that there is no longer need for them to pay attention to that particular call."

Counsel concedes, however, that claims 45 and 60 are as broad as any. For clarity claim 45 is analyzed by counsel for complainant as follows:

"A multiple car elevator signal system comprising

(1) a signal in a car,

(2) a suitable source of current and circuit system,

(3) means on a floor (the passenger's button) for giving a call (signal) and initiating a change (closure) in the normal (open) condition of the circuit system which controls the signal in the car,

(4) means (e. g., the detent mechanism in the floor-button box)
for maintaining such altered (close) circuit conditions and controlling the operation of the car signal after the cessation of the initiating act, combined with

(5) devices (restoring) equal in number to the cars and each constructed so that, if operated, it will restore the normal conditions."

The Herzog patent is dated May 28, 1912, and the application was filed November 6, 1893. In order to anticipate the Armstrong patent, No. 499,411, dated June 13, 1893, the complainant had the burden of establishing a prior public use. Evidence was introduced tending to show the installation of a construction under the Herzog patent in the Holland House, opened to the public December 6, 1891. Evidence was also introduced to show that in the spring of 1892, a similar system was installed in the Ames Building in Boston. For the purpose of this memo-

randum I have assumed that the evidence established prior public use of the Herzog device within the two-year period, so as to anticipate Armstrong.

The defendant's alleged infringing device is the installation in the Travelers' Insurance Company building at Hartford, Conn. In that building are two opposite groups of five elevators, serving eleven floors. On each floor are four push-button boxes, wired in parallel. Each box on the intermediate floor has an "up" and "down" button, so that the intending passenger may indicate the direction in which he desires to go. At each shift gate at each intermediate floor is an "up" and "down" lantern or light for indicating which car is approaching. Inside of each car is an annunciator for signaling the operator where the intending passenger desires the elevator to stop and the direction of travel desired. This annunciator is provided with two groups of lamps, one being "up" and the other "down." Each group includes a lamp for each intermediate floor. The "up" group also includes a lamp for the lower terminal floor, and the "down" group includes a lamp for the upper terminal floor.

A more detailed description of the mechanism, the circuits, and the devices used are set out in the stipulation, and for the purpose of this discussion it seems unnecessary to incorporate more herein. The Herzog's contrivance installed in the Holland House was a crude and indifferent thing. The defendant's installation in Hartford is the last word in elevator signaling. The following excerpt from the stipulation as to the Hartford construction is said to indicate the closest point to the installation where claim 45 in Herzog's patent can be read upon the device.

"Assume that an intending passenger presses a button at a given floor. The car bell circuit will be closed for a moment, and the bell rings in each car. One annunciator circuit is also closed, giving a light signal in each car and in the ground floor annunciator. This circuit will be maintained closed until the resetting magnet corresponding to the same button box becomes momentarily energized. Ordinarily it is desired that this should occur after an elevator has taken the passenger, and the operator has then operated his controller lever to cause the car to move in the direction that the passenger has indicated he wants to go. This is ordinarily the result, as at this time the elevator is at the position to have closed its resetting circuit for that direction of travel

at its proper commutator, and, before taking on the passenger and then moving the elevator onward, the operator has necessarily first de-energized the governor switch winding by throwing his controller handle to the 'off' position, and, after taking on the passenger, must energize the proper governor switch by operating the controller handle for the proper direction of travel. It is within the power of the elevator operator, however, to operate the resetting magnet by moving his controller handle 'off' and then 'on' again, without actually stopping or starting the car or taking on a passenger."

It is contended that subdivision 4 and subdivision 5 read precisely upon this mechanism; that the push button contrivance in the Hartford construction is the equivalent of the stick circuit of the Herzog patent; and that the restoration means the shifting by the operator of the control handle to an "off" and "on" position is the restoration device referred to in Herzog's claim 45. It is interesting to note that Herzog, the patentee, never seems to have pushed his patent applications with any zeal. See Herzog v. New York Telephone Co., 176 F. 349, 99 C. C. A. 623, where the claims of the patent were prepared some 14 years after the application was made.

Herzog's claim 60 is as follows:

"An elevator signal system, comprising at each of several floors normally open circuits, a calling device having terminals constructed and arranged to close said circuits and operable by a passenger for up and down calls, respectively together with a return signal receiving device on the floor constructed and arranged to operate only if the call on the floor has been operated."

It adds to the claim already referred to the signal back to the intending passenger that his call has been heard. In Herzog's there is the stick circuit, which the intending passenger closed by pressing the button, and which stays closed until the operator of the car throws a switch in the car, which de-energizes the magnet and makes the armature in the push-button box drop, and that armature works a signal to tell the passenger that somebody somewhere in one of the cars has opened the circuit, and that somebody, sometime, from somewhere will stop the elevator he is operating. In the Hartford system, by pushing the button the passenger closes a mechanical latch. First, a circuit is established, which fixes restoration; second, an independent circuit is established, which goes to each car and lights the lamps in the annunciator; third, a circuit is fixed, which

goes to the floor lamps. These latter circuits go through a commutator with an "up" and "down" specialization. The conductor of the elevator has nothing further to do. Lights are lit in the cars. The floor lights will go on when the car is in the proper position to signal its approach when coming in the proper direction. As the car stops and starts by operation of the operator in moving the car, the restoration occurs.

The Herzog patent, I have, for the purpose of the case, assumed to be a valid patent. As noted, the application for the patent was filed November 6, 1893. The Armstrong patent of June 13, 1893, for electric signaling purposes for elevators, was cited by the Patent Office against Herzog. The Armstrong was owned or controlled by the complainant in this suit, and the benefits of the monopoly of that patent were enjoyed during its life by the complainant. Herzog, when the Armstrong patent was cited against him, swore back of Armstrong by alleging the installation and public use in the Holland House in New York 23 months prior to his filing date. In 1910, the Armstrong patent expired. In 1910 the complainant was licensed under the Herzog patent. In 1912 the patent was granted. From 1893 until 1912 the patent was amended from time to time in the Patent Office until the present patent was secured. In the meantime, patents had been issued to Opdyke, in 1896, for an elevator signaling apparatus; in 1899, to Pedersen; in 1899, to Smalley and Reiners; in 1899, to Collett; and in 1903, to McLean.

It is to be observed that Herzog had secured his patent years after the elevator signaling art was crowded with devices. The real difference, however, between Herzog and the defendant, is the difference between manual control and automatic control. In Herzog; the operator of an elevator was obliged to act. He was obliged to restore the normal condition of the device, and he was obliged to operate the return signal device. In Herzog, everything depended upon the judgment and action of the conductor of the car. In the defendant's Hartford installation, the conductor of the car has nothing to do with the restoration or the giving of signals. He never sends a signal back. The defendant has done what Armstrong and Opdyke did. The defendant uses floor lamps to identify the elevators that will approach. Herzog had no floor lamp. It was old to identify the cars approaching the various floors with lamps; Armstrong and Opdyke had both done it.

There was no selective apparatus in Herzog. In Armstrong and in the defendant's there is a commutator and other selective apparatus for the floor lamp circuits. Herzog wired everything in series, so that a momentary break in any part of the apparatus destroyed the entire signal circuit. Armstrong wired in parallel; so does the defendant. It might be said here that the difference between wiring in series and in parallel is the difference between the wiring on a Christmas tree and the wiring ordinarily found in a house circuit. If one of the lights on an ordinary Christmas tree installation burns out, all the lights will go out. If, however, a single lamp in the ordinary house wiring burns out, the other lights will still remain useful. The defendant's signaling circuit is maintained by a mechanical latch. Armstrong, Opdyke, Smalley and Reiners, and Collett all show this device. Herzog's signaling means is maintained by the stick circuit method, or the holding magnet.

Defendant's restoration circuit is by the momentary energization of the magnet acting upon the mechanical latch. Herzog restores by the de-energization of the stick magnet. Herzog's "up" and "down" signaling involves no specialization of circuits. The defendant's "up" and "down" signaling does involve specialization, both of the restoration circuits and the restoration switch which act selectively according to the direction in which the car leaves the floor, and also of the floor lamp circuits where automatic direction switches are provided. The restoration switch in Herzog's are manually operated, and in defendant's they are coordinately controlled circuits of the car, so that they act automatically when the motor is started. Herzog, with his manually controlled restoring switch, completes the restoring by opening the circuit of the signaling push button. In the defendant's each of the restoration switches, when operated, tends to restore by "up" or "down" signal circuits, the commutator in the restoring circuit selecting the particular restoration circuit to be closed. In Herzog's, every elevator bell rings continuously while any passenger is waiting. The defendant has a single stroke attention bell in each elevator.

In the defendant's structure, when the push button is pressed there are three circuits affected, one fixes restoration, another leads off to the different cars, and the third to the floor lamps. The floor lamps circuit goes through commutators and directional switches, so that "up" and "down" has some specialization. The pushing of the button by

the passenger is the sole act by which the floor signal is given. It also lights the signal in the car. When the car is moving in the proper direction and is the proper distance from the intending passenger, the circuit initiated by the passenger to the floor lights is completed through the commutator and the directional switch, so that the floor light indicates the car which is about to answer the intending passenger's signal, and finally, when the car starts to leave the floor where it is stopped, the restoration is completed by means of a commutator and governor switch. Of course, in the defendant's installation there is a manual switch in each car, by which the operator, at his election, usually at a signal from the starter, may veto all signals.

Herzog, as before suggested, had an answer back contrivance; that is, the operator of a car by the restoration switch caused a signal in the push-botton box to be dropped, so as to indicate to the passenger that somebody was coming. This is wholly lacking in defendant's installation. The gist of the novelty in Herzog is said to be the means in the floor button box for maintaining the altered circuit condition for controlling the operation of the car signal after the cessation of the initiating act, with a device equal in number in each of the cars so constructed as to restore the circuit when operated. Of course, very broadly speaking, these elements of claim are to be found in defendant's structure; but they can only be found by the very broadest reading of this most belated patent brought to light after the Armstrong patent had expired. There was nothing new in this stick circuit as a means for maintaining a signal, nor was there anything new in the answer back or restoration by the person called by a given signal.

Herzog himself, in patent 870,102, application filed July 12, 1889, patent granted November 5, 1907, more than 18 years after the application was filed, discloses the exact circuit employed, merely duplicating the signals and the switches in the latter patent. He says (page 1 of the earlier patent, line 29): "The result is (after the pushing of the button) that the circuit will remain closed until it is momentarily broken at the distant point. This is done by a momentary depression of the key; thereupon the armature is drawn back by its spring and the circuit is broken." Herzog discloses the stick circuit in an electrical signaling apparatus with the restoration means at a distant point. The most that he did was to adopt this means to a plurality of elevators.

In the Gordon patent, No. 287,664, of October 30, 1883, a patent for electric fire alarm purposes, the pressing of a button sets a signal or target upon an annunciator. When the restoring button is pressed, it restores to normal all the signals which had been set. The only difference in Herzog is that the restoring mechanism restores the mechanism which initiated the particular signal. In Gordon, being a fire alarm system, the circumstances made it desirable that the restoration should be of all the signals.

The art of electrical signaling was old; maintaining the signal was old; restoring mechanism was old; placing elevators in banks was new. Assuming that there was patentable novelty in Herzog, the defendant's Hartford construction does not infringe. The defendant reaches a different result. He reaches it by different means. Westinghouse v. Boyden Power-Brake Co., 18 S. Ct. 707, 170 U. S. 537, 42 L. Ed. 1136.

[2] The Newell patent, No. 1,160,315, is said to be infringed by the defendant's Hartford installation. The specifications, so far as pertinent, are as follows:

"My invention relates to an elevator signaling apparatus, in which a signal or signaling means is provided which is adapted to give a signal to either the operator of the car or the intending passenger, and to restore the same and the circuits which operate such signaling means to normal condition, and which shall be controlled (preferably at the several floors) by the operator of the car, preferably through operation of the gate mechanism, and my object is to provide a construction which shall be simpler and less expensive to install than the mechanisms heretofore used.

"Prior devices which have been used have restored the signal circuits to normal condition solely by the operation of the doors or gates at the several floors, such, for example, as the two McLean patents, Nos. 748,408 and 748,409, and I believe that I am aware of all such mechanisms as have been in use or patented; but in most, if not all, of those in which the circuits are restored to normal condition merely by the floor gates or doors, it has been necessary to run at least one wire down the hatchway to each door, thus in, for example, a 20-story building, to run at least 20 wires down the hatchway to the several gates. This makes an expensive and objectionable construction, for the cost of installation in an elevator signaling apparatus is a very material factor in the ultimate cost to the owner of the building. * * *

"It will be evident that either one of these

two signaling means may be omitted without varying the operation of the remainder of the device, and obviously they may be of widely differing constructions, as will be evident to any one skilled in the art, as the main purpose of a signal means within a car is to signal the operator to stop at a floor, and the signaling means for the intending passenger is to tell him which car will take him aboard. It is also common in the art to use a series of signals in the car, one for each floor, as shown, for example, in patent 634,229. The signals shown in the drawings are, preferably, operable only when a car is approaching the floor, but it may not be desirable in all cases to have a signal in the car given only when the car approaches the floor at which the push button has been pushed."

The claim in suit is 22, as follows, the pertinent portions of which I have underlined.

"22. In an elevator signaling apparatus in combination, a car, electrically operated signaling means, means for operating the same comprising a passenger's button at each floor and mechanism corresponding to each button and set thereby, *restoring mechanism comprising a selecting device moved correspondingly with the car whereby the restoring mechanism is adapted to restore all said passenger's button set mechanisms in succession and correspondingly with the movement of the car, said restoring mechanism being normally incapable of accomplishing the restoration, and switch mechanism outside of and not carried by the car and controllable by the operator in the car* and adapted, when operated, to put said restoring mechanism in condition such that the selecting device will accomplish the restoration."

Broadly, Newell's contribution is said to be this: A restoring mechanism, comprising a commutator arrangement plus the operation of opening and closing a gate, to restore the signaling device to its normal condition. The operator of any car, by passing a floor where a signal has been given, cannot wipe off that signal, but to complete restoration it will be necessary for the operator of some one of the cars to stop at the floor and to open and close the gate. It was old to restore a circuit by opening and closing the gate. McLean patent, 748,409. It is said, however, it was new to combine with the opening and closing of the gate mechanism, which required the car to be in the zone of the signal to complete the restoring circuit.

The arrangement in Newell is the placing of the McLean gate switches in the Smalley and Reiners' transfer switch branch of the restoration circuit. In other words, McLean restored the circuits by means of switches in the floor gates or doors. Smalley and Reiners use a commutator mechanism. True, the Smalley and Reiners' switch in the car was normally closed, instead of normally opened, so that the operator could pass on down without restoring. The trouble with Smalley and Reiners' was that the restoration was completed if the operator did not answer the call. Newell came along, and fitted the McLean gate switch in the restoration circuit, so that two things must occur to complete restoration: The first, the car must be in the zone; and second, the operator must open and close the gate at the point where the particular signal was given in order to restore the signal.

Assuming there is novelty in Newell's contribution in the elevator signaling art, although there is no evidence that the device was used, or that it was valuable, the defendant does not infringe. Restoration in the Hartford installation is not by means of switch mechanism, it is not carried by the car, and is not controllable by the operator, but is effected by the starting of the car itself, after coming to a stop, which completes the restoration of the signal. Here again the defendant's structure does not employ the same means, nor produce the same result in the same way, or substantially the same way. The defendant's operation is automatic, and depends in no sense upon the act of the operator of the car. The Newell device in its final operation is not automatic, but manual, and depends upon the act of the operator of the car.

[3] The Andren patent, No. 1,109,950, was held not to be infringed. Elevator Supply & Repair Co. v. New & Beaver Arcade Co., 231 F. 744, 146 C. C. A. 28. In that case, the defendant's device did not have a switch controllable by the operator of the car. There is nothing in the record before me to indicate in the present case that the defendant used a switch device controllable by the operator of the car.

[4] The second Andren patent, No. 1,276,-158, plaintiff seeks to discontinue upon the payment of costs and without prejudice. Undoubtedly the plaintiff has a right to so discontinue. It might be said, however, in passing, that the charge made by counsel for defendant at the argument, that his client had been subjected to malicious persecution in the attempts to establish infringement of various patents owned by the plaintiff, may

have some basis in fact. At least, he has been subjected to litigation in a rather piecemeal fashion for a considerable period of years, necessitating a somewhat large expenditure of money.

The bills, three in number, will be dismissed.