**JENKINS METAL SHOPS, INC.,**
Plaintiff,

v.

**PNEUMAFIL CORPORATION,**
Defendant.

No. 2132.

United States District Court
W. D. North Carolina,
Charlotte Division.

June 24, 1969.

Clifton T. Hunt, Jr., Hunt & Rhodes, Greensboro, N. C., for plaintiff.

Robert W. Fiddler, New York City, and J. Carlton Fleming, Fleming, Robinson & Bradshaw, Charlotte, N. C., for defendant.

## MEMORANDUM OF DECISION AND JUDGMENT

McMILLAN, District Judge.

### PRELIMINARY STATEMENT

Jenkins Metal Shops, Inc., plaintiff, manufactured and displayed in an October, 1964, textile show a vacuum cleaning system called Card-A-Vac which, through suction, removes unwanted lint and trash from various parts of textile carding machines. The defendant Pneumafil is exclusive licensee of American rights to United States Patent No. 2,683,901 the "Griswold patent," which contains claims respecting certain card cleaning devices and methods. Pneumafil wrote Jenkins on January 13, 1965, suggesting that Jenkins' device infringes the claims of the Griswold patent. Jenkins, after further exchange of views, brought this action under 28 U. S.C., § 2201, for declaratory judgment that the Card-A-Vac does not infringe the Griswold patent claims. The case was tried in Charlotte without a jury.

## FINDINGS OF FACT

Some understanding of a carding machine and how it operates is necessary.

A card is a mechanical comb, roughly five feet wide, six feet high, and eight or nine feet long. It receives cotton fibers from a large roll in loosely matted form, cleans and straightens them by passing them between moving metal teeth, and discharges them as a loosely formed rope or "sliver" about half an inch in thickness, ready for the lengthening and spinning machines.

In more detail, and by reference to the Griswold patent diagram, Figure 1, showing a side view of a card:

July 20, 1954     H. W. GRISWOLD     2,683,901

FLY PREVENTION FOR CARDS

Filed Sept. 1, 1950

A *"lap"* or horizontal sheet of cotton fibers (12) about 3½ feet wide and ½-inch thick is unrolled from a rod or roll and pulled slowly by a feed roll (9) into contact with the lickerin (10), which is a cylinder a few inches in diameter and about four feet long, rotating in a counter-clockwise direction. The lickerin cylinder has numerous steel teeth around its circumference. These teeth pull fibers from the edge of the lap, a few fibers at a time; the fibers engage the teeth of the lickerin cylinder, are carried counter-clockwise around it, and start back up its right side, where they encounter the main card cylinder (14), which is a cylinder about four feet in diameter, also having fine teeth all over its outer surface, and rotating in a clockwise direction. The teeth of the lickerin cylinder and the main card cylinder pass each other, both traveling upward, at recommended clearances of about one hundredth of an inch. The surface of the main cylinder travels faster than the surface of the lickerin; and as they pass, the upward-pointing teeth on the main card cylinder engage particles of cotton fiber, lift them from the slower moving lickerin (much as one relay team runner receives the baton from another), and carry the fibers into orbit, clockwise, around the main cylinder. The fibers form a thin and transparent

"web." Above and around the top of the main cylinder, from about 9:30 to about 2:00 o'clock, are the "flats" (16), an endless series of flat metal sticks about 3½ feet long, mounted between chains resembling bicycle chains and driven by cog wheels or sprockets (38). The flats and cylinders are covered with card "clothing"—canvas or metal—in which are mounted thousands of short small metal wires similar to those in a fine wire brush. The flats move *very* slowly—just a few inches a minute—compared with the speed of the main cylinder surface which may be more than fifty feet a second; and the clearance between flats and the main cylinder is likewise about one hundredth of an inch.

After passing between the flats and the main cylinder, the fibers then, at the opposite end of the card, encounter the doffing cylinder (18), also covered with fine teeth, which rotates counter-clockwise and more slowly than the main cylinder. The doffing cylinder lifts the fibers from the main cylinder, and carries them down, around and up the right or discharge side of the doffing cylinder, where they are removed in a fine transparent film or "web" by a doffing comb (22), or take-off roll and drawn into a soft ½-inch rope or "sliver" (20), and stored in a can.

In this process dirt and trash and short fibers are removed and the fibers are untangled to some degree and made ready for further straightening and spinning on other machines.

Carding produces dust, trash, and fine lint. This is controlled to some degree by the enclosed casing (30), by the metal lickerin cover (33), by the metal doffer cover (31), and by a metal screen or "back plate" fitting around the main cylinder between the lickerin cover and the flats on the lickerin end (33) and front plates between the doffer cover and the flats (31) on the doffer end. However, much lint and trash escape under the machine and at the main points of transfer where fiber is transferred from one roll or cylinder to another. These points are between the lickerin cover (33) and the lap (9); between the lickerin cover and the back plate (33a); between the back plate and the flats; between the flats and the front plate at the doffer end (46); and between the front plate and the doffing cylinder cover (31a). Further, at the "bights" (24a) and (26a), where the flats bend to go around the sprockets at each end, the cracks between the flats are opened up and lint escapes.

Keeping cards and the surrounding atmosphere clean has always been a problem. Trash and lint under the frame are still removed by hand. Many mills still use "make-up sticks" and scavenger rolls. Scavenger rolls are wooden rollers covered with lint-catching fabric which are laid in the crack at the transfer point between the feed roll and the lickerin cover. Make-up sticks are triangular shaped wooden sticks covered with lint-catching fabric which are laid in the cracks at the transfer points between the back plate and the lickerin cover (33a) and between the front plates and the doffing cylinder cover (31a) to catch lint and trash extruded from those cracks.

Loose lint in the air, sometimes called "fly," slows production and reduces quality of the product. Through the years suction in one form or another has been used to control this "fly."

The plaintiff's Card-A-Vac device, schematically illustrated by superimposing its plenums on the Griswold patent drawing (Figure 2), cleans cards and surrounding air by suction or vacuum. At the lickerin end this suction is applied through a curved lint-catcher or suction duct or plenum (a) the same length as the lickerin, which rests on the lickerin cover and draws in air through two downward-slanting slots or intake orifices. One intake slot (b) slants down toward the feed roll and the other intake slot (c) slants down toward the troublesome trash-producing crack between the lickerin cover and the back plate or main card cylinder cover. At the doffer end, a similar downward-slanting suction duct or plenum (d) is located between the dof-

fer cover and the front plate or main card cylinder cover.

At the lickerin end the Card-A-Vac suction orifice facing the back plate is four inches or so below the "bights" or the lowest curve of the flats. At the doffer end it is about seven inches below the bights.

July 20, 1954     H. W. GRISWOLD     2,683,901

FLY PREVENTION FOR CARDS

Filed Sept. 1, 1950

With Card-A-Vac cleaning the scavenger roll is eliminated from its usual spot between the feed roll and the lickerin cover, and the trash collecting "make-up" sticks are eliminated from the cracks adjacent to the main card cylinder cover.

Suction draws air from all directions; it does not have the straight line directional characteristics of a jet or puff of blown or propelled air. This was illustrated at the trial with a lighted match. A match can easily be blown out by a puff or stream of air at distances of more than a foot. However, *suction* of the same volume of air has no noticeable effect on the air around a lighted match until the match is within a fraction of an inch of the lips and is thus within a "suction-applying" distance from or relationship to the flame.

## THE PATENT CLAIMS ANALYZED

Pneumafil claims and Jenkins asserts the absence of infringement by Jenkins of claims 1, 4, 7 and 9 of the Griswold patent. Claims 1 and 4 are apparatus claims and claims 7 and 9 are method or "results" claims. Although all four claims describe a carding machine, the description of the conventional card is just a vehicle to support the suction device claims; the card machine itself is not claimed as such by the patent. The claims are as follows:

Claim 1. A card comprising in combination a main card cylinder, a lickerin, a lickerin cover, and endless

chain of flats in carding relationship to the cylinder and arranged in a pair of flights separated by a pair of bights, one of the bights being adjacent the lickerin and a suction hood for collecting air across the width of the lickerin, said hood being adjacent the lickerin cover and arranged to draw air through said adjacent bight and to draw in fly released adjacent the cover.

Claim 1 relates to apparatus providing vacuum cleaning by suction at the lickerin or input end of the card. It contemplates (a) a *suction hood* adjacent the lickerin cover and (b) *arranged* to draw air (c) through the adjacent *bight* and (d) to draw in fly released adjacent the cover.

When claim 1 (originally claim 8) was first reviewed in the Patent Office the examiner required amendment to provide a "specific antecedent basis" for its subject matter. In response the applicant, Griswold, clarified the drawing by adding the numbers (33), (57), and (57a), and added the following language:

"The casing (30) includes shields 31 adjacent the main and doffing cylinder; *and includes shield or cover (33) adjacent the lickerin roll (10) and proximate portions of the main cylinder.*" (Patent Column 3, lines 9–13; new matter emphasized.)

\* \* \* \* \* \*

"Shield (33) is provided at one end with an apron (57) as shown which is disposed closely adjacent and *in gas-tight contact* with the other edge of hood (50) at (57a) \* \* \*." (Patent Column 3, lines 57–61; emphasis added.)

The revised description including the addition of the new numerals (33), (57) and (57a) make it clear that the claim of the patent is for a continuous one-piece or integrated (or at least leak-proof) cover over *both lickerin and main cylinder*, connecting below the bights through an apron (57) in *gas-tight relationship* with a suction *hood*.

Such an apparatus is obviously not *arranged* to draw air from a crack or joint between a conventional lickerin cover and a conventional back plate on the main cylinder. It is obviously *arranged* to draw air down through the bights. The claims of the patent, thus narrowed and restricted by actions of the patentee to get patent office approval, do not cover the Card-A-Vac, which is a duct with a suction orifice (though not a *hood*) *arranged* to draw air not *down* through the bights but *up* through the joint between lickerin cover and main cylinder cover—a different source of debris—another of the trash and fly-producing transfer points or joints on the card.

It appears in fact that although the Card-A-Vac suction device does include a plenum or duct with a lengthwise suction orifice, this plenum or duct cannot properly be described as a suction *hood*, because the Card-A-Vac plenum *does not fit over nor cover* any opening or source of debris; it simply lies on top of the lickerin cover and has a downward slanting intake slot lying near the joint (33a) between lickerin cover and main card cover or back plate.

During the trial the court saw the Card-A-Vac in operation. From this observation and from the testimony it is found that when Card-A-Vac is in operation some air does pass slowly down into the suction orifice from the bight of the flats above. This in the court's opinion is an incidental rather than a planned result; it is not something the plaintiff's apparatus was *arranged* to do. Patent infringement is not proved simply by showing that the accused device accomplishes or produces the same result, in whole or in part, as the device claimed in the patent. There is no patent on the *result*; the patent is awarded for a "distinctive means of accomplishing the result." Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 569, 18 S.Ct. 707, 42 L.Ed. 1136 (1898); Wheeling Stamping Co. v. Standard Cap and Molding Co., 155 F.2d 6, 8 (4th Cir., 1946); Demco, Inc., v. Doughnut Machine Corp., 62 F.2d 23, 25 (4th Cir.,

1932). The patentee's means of accomplishing the result in this case do not embrace the equally distinctive means employed by the plaintiff.

If the patentee's claims were taken literally, they would create a monopoly on all vacuum systems which have the result, incidental or otherwise, of causing air to flow out the ends of the bights. Such broadness of claim obviously cannot stand in light of the prior art in the form of the Holt patent number 560,969 (applied for in 1942), which was in essence a set of claims covering a suction hood like the hood over a restuarant stove, which extended over and around the flats, bights and cylinder, and by "bull strength and awkwardness" would draw air through the bights and from all other areas of the card. It is not enough to reach the desired result; the method of reaching it must be a contribution to knowledge, if it is to merit a government created monopoly. Claim 1 is not infringed.

Claim 4. A card comprising in combination a main card cylinder, a doffing cylinder, a cover for adjacent segments of the cylinders, an endless chain of flats in carding relationship to the main cylinder, the flats being arranged in a pair of flights separated by a pair of bights, one bight being above the cover, means for removing fibers from the flats in said bight and a suction hood underlying and in suction-applying relation with a substantial portion of the area of said bight for collecting air across the width of the cover, said hood having a longitudinal air intake throttling slot at least about as wide as the maximum space between flats at the bight and being constructed and arranged to draw in fly released adjacent the bight and to draw in fibers dropped by the removing means.

Claim 4 (claim 9 in the original application) relates to apparatus providing vacuum cleaning by suction at the doffer or output end of the card. This claim started out to describe "a cover for adjacent segments of the [main and doffer] cylinder * * * means for removing fibers from the flats in said bight, and a *suction hood* for collecting air across the width of the cover, said hood being constructed and arranged to draw in fly released adjacent the [edges of the cover] and to draw in fibers dropped by the removing means." This original claim was rejected as fully covered by British patent 7565 (filed 1915) which claimed a suction tube located, like the Card-A-Vac suction slot, in the crack between the main card cylinder and the doffing cylinder, and having two suction orifices—one pointed *up* to catch droppings from the flats, and one pointed *down* to catch fly and trash from the slot between doffer cover and main card cylinder cover. Thereafter the applicant Griswold amended the claim to say precisely that the suction hood should be "underlying *and in suction-applying relation* with a substantial portion of the area of said bight * * *." (Griswold Patent Column 5, lines 29–31.) In pursuing this with the patent office Griswold asserted that the Wilson patent suction tube, positioned in the slot or trough between doffing cylinder and main cylinder, was "*nowhere near suction-applying relation with*" the bight overhead, and "*plays no part in removing fly from the area of flats * * *.*" On the strength of those contentions the patent was issued.

Those amended statements were true in favor of Griswold in 1952, and they are still true against him in 1969. They correctly describe the action of the Card-A-Vac system, which is quite similar to the previous Wilson device. Claim 4 is not infringed.

Claim 7. The method of reducing the amount of solids suspended in the air surrounding a flat card having a card cylinder and an endless chain of flats in carding relationship with the cylinder, the flats being disposed parallel to the axis of the cylinder and in a pair of flights separated by a pair of bights, said flats being relatively close together substantially throughout the flights and relatively separat-

ed at the bights, whereby said flights form an air enclosure having side openings between the flights and end openings between the flats at the bights, which method comprises continuously flowing air into said enclosure through said side openings, continuously exhausting the air from said enclosure through said end openings, and controlling the air flow at a substantially constant rate sufficient to reduce the amount of solids suspended in the air surrounding said flat card.

Claim 7 does not describe any apparatus. It simply seeks a monopoly on any activity which causes air to pass into the side openings of the flats and out through the bights at the ends, removing lint and dust as it goes. This was originally Application Claim 2, and it was rejected on the basis of British Patent 21,672 (Wilson patent, year 1898), which clearly claimed rights on suction devices which were located almost close enough to touch the bights and which pulled air out through the bights. After some correspondence, the Griswold claim was allowed on the theory that Griswold contemplated *constant* suction rather than *intermittent* suction. [Since the parties to this action are not litigating the validity of the patent, we will not try to decide whether, in this context, that may be a distinction without a difference.] There is a significant difference between Card-A-Vac and patent claim number 7, in that the Card-A-Vac suction slot, pointing downward and remote from the bights, is not a device *located, arranged or designed to produce* the flow of air contemplated by claim 7. Again, the licensee should be held to the detriment as well as the benefit of Griswold's patent office representations. In order to get around British Patent 21,672, Griswold argued to the patent office that even though located almost close enough to touch the flats as they passed, the Wilson suction orifice "*could not conceivably cause an appreciable amount of air*" to flow into the sides and out the bights of the flats. Furthermore, if the suction plenum in the

crack or trough covered by the other Wilson patent (British 7565), discussed above under claim 4, was "*nowhere near suction-applying relation*" with the bights at the doffer end, and "plays no part in removing fly from the area of flats," as Griswold contended, then certainly the Card-A-Vac doffer cleaner, equally remote from the flats and pointing downward, can also stand along with Griswold. Claim 7 is not infringed.

Claim 9. The method of reducing the amount of solids suspended in the air in the neighborhood of the fiber-removing means at the doffer end bight of the chain of flats of a flat card, which comprises inducing a flow of air downwardly past said fiber-removing means and from said bight, collecting said air by hood means spaced from the bight, and controlling said induced air flow at a substantially constant rate sufficient to retard escape of fly which tends to be released from said flats.

Claim 9 started out as Application Claim 15, later became claim 22, and finally became claim 9. It describes not *methods* but *results*. It contemplates passing air through the bights at the doffer end of the card and collecting fiber from the air. The claim does not specify either suction or blown air and is broad enough to include all forms of inducing air movement, including, for example, a remote electric fan. Since the purpose and action and location of Card-A-Vac are to suck air up and out of a joint below the suction orifice, rather than to draw air down from the remote cracks between the flats, claim 9 is not infringed.

## CONCLUSIONS OF LAW

None of the Griswold patent claims are infringed by the plaintiff's card cleaning apparatus as described and demonstrated in the testimony.

## JUDGMENT

The plaintiff's Card-A-Vac card cleaning system, as described and demon-

strated at the trial, does not infringe the claims of the defendant's Griswold patent, and plaintiff is free to manufacture and sell Card-A-Vac, as thus described, without license from or royalty to defendant.